# EXHIBIT A

June 15, 2015

# Blankenship v. Wal-Mart Stores Inc. and General Electric Rule 26 Report

To:

Michael E. Carr, Esquire
Carr & Carr
4416 South Harvard Avenue
Tulsa, Oklahoma  74135

From:

William F. Kitzes
Consumer Safety Associates. LLC
4501 NW 25th Way
Boca Raton, FL 33434

The following report is preliminary and based on information available to date. The issues described below are subject to change as additional information becomes available.

<u>Background and Qualifications</u>

I am a Board Certified Product Safety Manager and Hazard Control Manager.  I hold an Executive Certificate in Safety Management from the American Society of Safety Engineers, and I am a member of the Human Factors and Ergonomics Society.  I hold a Certificate in Risk Communication from the Harvard School of Public Health.  For the past 30 years, I have provided risk assessment and product safety management services to attorneys, corporations and government organizations.

From 1974 to 1981, I worked at the U.S.  Consumer Product Safety Commission (CPSC), part of which time I served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying products which contained a defect which could create a substantial product hazard, developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act including the recall of substantially hazardous consumer products, and notification to the public of the danger through warnings and other media.  (See attached Curriculum Vitae).

As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries.  Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns resulting in publication of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*.  I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

2

I have been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for warnings and safe operation of industrial equipment, *Nobel Chemical Company* for adequacy of warnings, *Corning Glass* for evaluation of recalls, *BernzOmatic*, a division of the Newell Group, for development of point-of purchase recall displays, warnings, and advertising, *Arctic Cat, Inc.* for analysis of all-terrain vehicle off-road safety, including owner's manuals, instructions, warnings and foreseeable use, and *Visioneer*, Inc. in developing a program to upgrade computer scanners. I have developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for Carson Industries, Inc. and assisted *CISCO Systems* in recall development. I have designed a warning label for *Whisper Communications, Inc.*, and assisted *Wham-O, Inc.* in recall procedures. I have provided risk analysis, recall assistance and consumer warnings and instructions to Restoration *Hardware, Inc.*, have developed warnings for *Plastics Research Corp.* concerning use of decorative building materials as protective barriers. I have reviewed advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recall issues. I have advised *Swimways Corporation* on product safety management and warnings. I have advised *AsiaEXP* on risk assessment, labeling and product standards and have assisted *Dick's Sporting Goods* in developing safety communications and warnings. I served as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*. For *Rollz International* (Netherlands), I revised the user manual for American and Canadian markets. I provided research and analysis on ATV safety for the National Association of Attorneys General and served as the Chairman of the *Florida Consumer's Council* (1993-2007).

I have developed on-product warnings and instructions for a number of manufacturers and distributors. A few examples include:

- <u>Vendo Company</u> for vending machine warnings
- <u>Arctic Cat, Inc.</u> for ATV's
- <u>Whisper Communications</u> for electrocution hazards
- <u>Plastics Research Corp.</u> for building material warnings
- <u>Daewoo Heavy Industries America</u> for labeling of heavy machinery

3

- Swimways Corporation for warnings on children's pool products
- Dick's Sporting Goods for fitness equipment

I have lectured at the National Safety Council Annual Congress and Exposition on the following topics:

- When Risk Can't Be Eliminated:  Building Adequate Warnings, Los Angeles, California, 1998
- Injury Prevention Analysis:  Guidelines for Product Safety Managers, Chicago, Illinois, 1997
- Post Sale Corrective Action Plans - Recalls and Consumer Notice, Orlando, Florida, 1996

I have also addressed industry groups on warnings issues for the International Consumer Product Health and Safety Organization and the CPSC.

In 1991, I wrote an article for Professional Safety, the Journal of the American Society of Safety Engineers (ASSE), entitled *Safety Management and the Consumer Product Safety Commission*.  Reviewed and accepted by the ASSE editorial board, the section on warnings reads in part:

> VI.  *Warn users of product dangers and motivate them to avoid injury.*
>
> In addition to hazard elimination, product warnings and instructions must help the user avoid dangers, including those that remain after thorough attempts to eliminate or guard.  An explicit warning that includes a signal word, statement of the hazard, appropriate behavior and description of the danger's consequences is required.  A pictogram illustrating consequences often helps communicate the danger, especially to those who cannot read.

4

Product Safety Management

Product safety management is a system that a reasonably prudent manufacturer and importer put in place <u>before</u> the first product is conceived to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe. It starts with a statement of commitment for product safety from top management and develops a company's procedures to <u>identify hazards</u>, <u>assess the risk</u>, <u>apply adequate safety measures to eliminate hazards</u> from the design, places a <u>guard between users and potential injury</u> and to <u>warn users of all hazards</u> that have not been eliminated or adequately guarded through technically feasible and economically practical safety measures.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. As can be shown from the wide dissemination and acceptance by academia, business and legal professionals, these concepts are widely used and accepted throughout the safety community.

Safety management is primarily a tool to protect consumers before they purchase products. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating a company's product safety management program, it is incumbent upon a reasonably prudent manufacturer and importer to apply the following accepted safety principles to ensure that the products are reasonably safe.

1.    <u>Establish and observe a written safety policy</u>. This policy should emphasize commitment to safety. In writing, it will insure all employees obtain clear guidance on safety issues. The policy should set forth a method for discussing safety responsibilities.

2.    <u>Adequately identify and evaluate product hazards</u>. A hazard is the inherent capability of a product to do harm. Manufacturers, distributors, and retailers must review the potential injury-causing energy and evaluate severity and foreseeability.

3.      Perform an adequate risk assessment integrating product hazards, the environment, and foreseeable consumer use. Once hazards are identified, the reasonably prudent manufacturer/distributor/retailer must consider the conditions of use under which the injury-causing mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used, especially in light of product promotion, is critical in discerning how the consumer may foreseeably use the product, even if it is not the use intended by the manufacturer.

The product must be reasonably safe prior to distribution in commerce. If it is not possible to eliminate the hazard, the reasonably prudent manufacturer, distributor, and retailer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

4.      Monitor the safety performance of the product after sale and use, and take corrective action where necessary. Once products are distributed to consumers, a responsible manufacturer/distributor/retailer must determine where injuries can occur, or if a product defect (including lack of adequate labeling and safety information) could create injuries. Where corrective action is needed to reduce or eliminate injuries, consumer notification and additional corrective measures must be implemented to insure consumer safety.

5.      Develop adequate warnings and training to motivate consumers to understand and avoid dangers. This is critical and relatively inexpensive. When consumers have sufficient data to make an informed decision about safety, they are in a better position to address safety issues.

*      *      *      *      *

A key precept of safety management concerns products with inherent capability to do harm. In priority order, the duty of a reasonably prudent manufacturer and importer is to eliminate the hazard, or, if this is not possible while preserving utility, guard against the hazard. At a minimum, the manufacturer must properly inform users of the danger inherent in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

- Eliminate hazards

- When hazards cannot be eliminated, provide feasible safeguards against them

- Provide warnings and personal protective equipment against remaining hazards

National Safety Council
Product Safety Management Guidelines, 1989

\*     \*     \*     \*     \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*. The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1. Executive interest and support
2. Cause-analysis
3. Selection and application of remedy
4. Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices. Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission incorporated these principles in its 1975 publication, updated in 2006, *Handbook and Standard for Manufacturing Safer Consumer Products*. The Commission addressed executive action, design review, distribution and corrective action.

In 1983, Harold Roland of the University of Southern California Institute of Safety and Systems Management and Brian Moriarty authored *System Safety Engineering and Management,* outlining the need for product safety policy and analysis to prevent injuries. They evaluated hazard identification, severity and a systematic approach to identify defects.

The National Safety Council first published *Product Safety Management Guidelines* in 1989 describing the relationship between marketing, manufacturing, and safety communications as a key to corporate accident prevention. Their analysis includes the hierarchy of safety management and prevention programs to substantially reduce or eliminate injuries.

Incident

On July 26, 2013, Tina Blankenship was using her GE food processor purchased at Walmart during June/July 2011 to make zucchini bread. When attempting to chop the second batch of zucchini, the processor left a couple of chunks of zucchini that had not been fully processed. She took off the lid and reached her hand inside the bowl and when she touched the blade, the motor came on and the blade started to rotate. She described the severe injury to her fingers a looking like "chopped wieners."

Lessons from Walmart's Website

The values that set us apart from others -- respect for the individual, service to our customers and striving for excellence -- rest on the foundation of personal integrity and responsibility.

A strong commitment to ethics and integrity isn't just the right way to do business. It's how we earn the trust and respect that is critical to our success, and our ability to help more people live better. Our customers trust us to be their advocate. Our suppliers trust us to be an equitable partner. And as Walmart associates, we trust each other to uphold the highest standards of conduct every day.

Mike Duke
President and CEO
Walmart  2014

<u>Walmart Global Statement of Ethics</u>

Health & Safety

Walmart is also committed to protecting the health and safety of our associates, members, customers and communities because we care for one another's well-being.  Conducting our business in compliance with all health and safety laws is crucial to protecting each other from harm.  As associates of Walmart, we must always comply with all relevant health and safety laws and policies and never ignore a potential health and safety concern.  Acting ethically in regards to health and safety issues is critical to our corporate goal of providing a safe shopping and working environment.

<u>Walmart Minimum Requirements for Suppliers</u>

Product Safety and Compliance

Product Safety and Compliance administers programs to identify, mitigate and monitor risks associated with general merchandise. We strive to set clear expectations within the supply chain and develop reasonable levels of assurance and procedures for corrective action.

<u>Walmart Requirements for Suppliers</u>

Quality Assurance Through Testing

Customer service - satisfaction guaranteed - is Walmart's No. 1 goal. As part of our continuing effort to ensure product quality and reliability, we use different independent third party testing labs to provide a safety net test on products such as food, children's products, apparel, home and pharmacy. As a rule, Walmart and Sam's Club test products at our discretion to ensure they comply with the highest safety standards set by state and federal government statutes.

Industry Knowledge and Integrity

At Walmart/Sam's Club we're committed to buying and selling merchandise more efficiently than anyone. We want customers to know that they can trust the quality of our merchandise and know they are

receiving their products at Every Day Low Prices. In order to accomplish this, we expect our suppliers to be knowledgeable about their industry and each product or service they provide to Walmart. We require a high level of communication and integrity from each of our suppliers so that we can better serve our customers.

<u>Depositions</u>

The depositions of Walmart employees are instructive.

<u>Joe Bussell -- Locke vs. Wal-Mart and GE, January 27, 2014</u>

- Current position at Walmart is senior manager of product recalls and reporting.

- I lead the team that manages requirements for federal reporting of incidents and injuries to the CPSC.

- We manage all product removals, withdrawals and CPSC recalls.

- Recall is where CPSC is involved and we're actually getting product back from consumers.

- That would be where we have a safety issue deemed by the CPSC that necessitates a recall.

- And then we would have press releases, posters and all the requirements under those rules.

- There is no written manual on when to begin conducting a recall.

- I don't know how Walmart would receive knowledge that a product is unsafe.

- We receive allegations of injuries associated with products.

- Again, we're not engineers, we're not manufacturers, we can't determine that a product has a defect that's causing those injuries.  We can only receive the complaints.

- The supplier should notify CPSC.

10

- We do not know if there is a product defect causing allegations of injury.

- Walmart is not an engineer or a manufacturer, we're a retailer.

- There would be no role in the design and manufacturing stage for Walmart other than typical negotiation of what price point will it be made.

- Walmart would not have notice of any interlock failure before the product is shipped.

- There have been circumstances where Walmart has initiated a recall of a product without prompting by the Consumer Product Safety Commission. Typically when there is a violation of federal regulations.

- We received notification from the CPSC that they wanted to conduct a full 15(b) report investigation on the product as a response to the reports of incidents.

- In the case of the GE food processor, the CPSC advised Walmart that they wanted a 15(b) report, yes.

- Is that defined by Walmart as a voluntary recall? -- That's defined by CPSC as a voluntary recall.

- Walmart decided on its own to conduct a recall in response to the full report after notice from the CPSC.

- Walmart did not have plans to conduct a recall before the CPSC asked for a report.

- There was never any discussion or consideration before CPSC asked for the report.

- Walmart's decision to recall was just solely based on the complaints and coordination with CPSC.

- No one validated there was a defect through evaluation of any individual complaint.

Joe Bussell  --  Blankenship et al., vs. Wal-Mart and GE, May 29, 2015

- Joe Bussell testified that he read the deposition transcript from his deposition in *Locke vs. Wal-Mart and GE.*

- Joe Bussell testified that he would not change any answers he gave in the deposition that he gave in *Locke vs. Wal-Mart and GE.*

Cara Rose  --  Blankenship et al vs. Wal-Mart and GE, May 28, 2015

- Recall posters would be placed by the restrooms in the back of the stores and\or at the service desks.

- Recall posters would typically stay up for 120 days.

Jorge Garcia  --  Blankenship et al vs. Wal-Mart and GE, May 29, 2015

- Director of Product Development for the GE Food Processor

- States he does not know whether a food processor that fails to meet the UL standard governing food processors could be potentially dangerous.

- States the GE Food Processor was very safe.

- Would not have done anything differently with respect to the GE Food Processor.

- No need to have pulled the product from the shelf earlier than when it was.

<u>Responsibilities of an Importer</u>

In 1972, the Consumer Product Safety Act [15 USC 2051 et seq.] was established to protect consumers from unreasonable risks of injury.  Section 3(a)(4) of the Act defines a manufacturer as any person who manufactures or **imports** a consumer product [emphasis added].  All the requirements to import reasonably safe consumer products manufactured outside the United States become the responsibility of the importer under the Act.  An importer must implement an adequate product safety program to insure the protection of consumers.

In October of 1975, the Consumer Product Safety Commission (CPSC) issued a policy on the importation of consumer products published at 16 CFR 1009.3.  The rule recognized "the critical position of importers in protecting American consumers from unreasonably hazardous products made abroad and accordingly, under that Act, importers are made subject to the same responsibilities as domestic manufacturers."

In 1975, and again in 2006, the CPSC published the "Handbook and Standard for Manufacturing Safer Consumer Products."  The Handbook addresses the essential elements of industrial systems for manufacturing safer consumer products and identifies the role of the manufacturer / importer, and relates the concept to executive action.  The introduction states:

> Manufacturers must assure the safety of consumer products.  This is achieved through the design, production and distribution of the products they manufacture.  It is best accomplished by a comprehensive systems approach to product safety, which includes every step from the creation of a product design to the ultimate use of the product by the consumer.  The basic concepts for a comprehensive systems approach for the design, production and distribution of consumer products are discussed in this Handbook.

Chronology of Events  --  Notice and Knowledge

Walmart Global Procurement Product Specification
Original October 9, 2008
Revised June 15, 2009
GE Food Processor

GE Trademark Licensing
Joseph Louie -- Senior Safety Engineer
March 11, 2009
Initial Product Comments  --  Food Processor - Demeter EB Model

- Switch stem rotates against a stationary metal actuator.

- This is not good practice due to long-term wear.

- If blade is inserted crooked while unit is plugged in and chop, shred or dough has been pressed, unit will turn ON.  This needs to be corrected.

E-mail from Joseph Louie to Chris Ho@wal-mart.com
May 5, 2009

- I received modified parts of the fix to prevent accidental actuation of the motor.

- Thanks everyone for working on this fix to prevent a potential safety hazard.

July, 2009:  Food processor with defective safety interlock detected

E-mail from Chris Ho (Walmart) to Walmart and GE Corporate
Subject:  Interlock switch for GE food processor
July 24, 2009

- For items that have been shipped out

- Risk evaluation and solutions for avoiding risk happen on the marketplace

14

E-mail from Cynthia Gong (GE Corporate) to Zhen Tao Zhang (GE Corporate)
July 27, 2009

- Chris plans to visit Demeter for food processor interlock switch malfunction issue this Wednesday.


E-mail from Nelson Fong to Bobby Wiley
July 28, 2009

- Nelson Fong is Walmart Global Procurement, Shenzhen.

- Heads up on issue regarding quality failure of the GE food processor.

- The interlock of the product does not function well and could bring serious critical issues in respect to product safety.

- 11,000 units are on the water to arrive in the states August 20th.

- Passed ITS production test, in-line and final inspection, and GE testing.

- There was one unit failed the interlock function in one of the previous final inspections.

- Supplier factory rework without Walmart global procurement's review on their corrective action.

- Since the re-inspection, got a passed result, the shipment was released.

- MQE is investigating the root cause of the failure.

E-mail from Jorge Garcia (Walmart) to a long list
July 29, 2009

- A short recap of items from this morning's meeting.

- GE food processor is part of the new GE brand relaunch.  It will be one of the items that will be featured during TV campaign supporting the brand relaunch.

- GP Quality has placed all food processors on hold that include the 9000 which were reworked by Demeter.  Hold will remain until root cause has been agreed to.

- GP Quality has requested samples to illustrate failure modes.

- 11,000 units have been shipped and potentially have the same defects as those found in the inspection of the 9000 units.

- This is a key product that is part of our brand relaunch strategy.  We must make sure the product is safe and of good quality.


E-mail from William Hamlett (Walmart) to Tony Judge (Walmart)
July 30, 2009

- William Hamlett is Technical Director, Home Division, Product and Trend Development for Wal-Mart Stores Inc., Bentonville, Arkansas.

- Tony, I need your help.  If the supplier does not ship within the next week, we will miss our window for the tab.

- Sense the 9000 units on the latest PO were checked and noncompliant products taken out, is there a reason to hold up the shipment?

- We will be conducting the same tests on the initial order of 11,000 that was not rejected and shipped at our distribution centers in the U.S.

- Please advise if we may ship while the root cause is being reviewed.

E-mail from Tony Judge (Walmart) to William Hamlett (Walmart) and others
August 3, 2009
Subject:  Demeter:  Food Processor Sort Process

- As we discussed on our conference call Friday night the sticking of the safety interlock mechanism is not as straightforward as Demeter and the factory would like us to believe.

- The root cause has not definitely been identified and the original suggestion of glue contamination appears less likely than friction inside the actuator spindle housing.

- Of great concern was the "doctored" video presented to us to show that the glue causes the sticking.

- The concerns about authenticity was shared by all Walmart Global Procurement Associates.

E-mail from Victor Tang to Agnes Law, Tony Judge and others
August 5, 2009

- We did have a tel con with US last night.  It appears that replacement of the spindle assembly is the best option for shipped quantity and finished stock in factory based on your analysis.

E-mail from Agnes Law to Victor Tang
August 5, 2009

- We are now preparing 15,000 sets of shaft assemblies to be sent to the U.S. and Canada for rework.

Wal-Mart Stores Nationwide Net Sales

- September 12, 2009:  Retail sales of the food processors begin.

<u>E-mail from Michael O'Connor to Richard Chen (Global Procurement) and
Jorge Garcia (Walmart)</u>
<u>September 16, 2009</u>

- We have reworked over 9,220 units.

- Yesterday during an inspection there was a unit that continued to run after the lid was opened.  Confirmed the unit had new reworked shaft assembly.

- I am requesting 100% retest on the 720 pieces in the PO.


<u>E-mail from Richard Chen (Global Procurement) to Victor Tang and Jorge Garcia</u>
<u>September 17, 2009</u>

- Can you please advise what is the root cause of the failure?  This is a critical safety issue and we have to seriously look into this immediately.


<u>Internal E-mail from GE</u>
<u>November 3, 2009</u>

- Did you see the change Demeter did?  They will need to make a new part and modification of an existing part.  Can you get me a drawing of the changed parts?


<u>Consumer Injury</u>
<u>April 2, 2010</u>

- Walmart learned a consumer in California was injured when the blades to the food processor spontaneously began to spin while her hand was in the bowl of the food processor.

Walmart Summary
April 23, 2010

- 7/17/09   Functional checks found safety failure, 1 piece blades failed to stop.

- 7/20/09   9000 units reworked, find 10 defective safety switches.

- 7/28/09   Internal discussion amongst Walmart Sourcing, Merchandising and MQE in GP (Global Procurement) office, agreed the product has potential safety risk.

- 7/29/09   As this is a critical safety feature GP request Demeter to reinvestigate root cause.

- 8/3/09   GP meets Demeter to review simulation tests which were not considered convincible as they did not meet product specifications.

  We consider the root causes are combined by various factors but all direct to the shaft and spindle.  Supplier agrees to change spindle assembly with all factory and finished goods.

- 10/7/09   13,591 units in store or in transit are reworked.

- 9/15/10   Visit Demeter and meeting for further follow up after claim received.

  Demeter suggests to shorten the length of the shaft so it would sit totally inside the spindle instead of exposing outside.


June/July 2010

- Tina Blankenship purchased subject GE food processor at Walmart.

<u>E-mail from Audrey Gappy (Walmart) to Cindy Wu and others at Intertek</u>
<u>September 9, 2010</u>

- We have had an incident that resulted in a consumer injury - please review safety information.

- Employee touched the top of the axle/spindle that holds the blade.  The motor was activated resulting in cuts to the employee's hand.

- She required an emergency hospital visit, many stitches.

- Unable to return to her position as full-time resident counselor.

- I did a preliminary investigation.

- There is no caution note stating the machine can start up when the lid is not in place.  There is no caution note stating there is a serious risk of injury if plugged in while the lid is not in place.


<u>Consumer Testing Laboratories</u>
<u>Evaluation of Test Results</u>
<u>September 14, 2010 To Jorge Garcia on the GE food processor</u>

- Reason for Analysis:  Failure modes and Effects Analysis of 100 customer returned GE food processor samples to validate and determine the cause of the customer return as requested by the client.

- Note our analysis is undertaken solely to determine performance characteristics.

- Our report is not an evaluation of the safety characteristics of the sample.  This report is not an analysis of potential safety hazards that can occur in actual use misuse and/or abuse of the product.

- 47 of the 100 samples evaluated had customer return reasons that were able to be validated during the evaluation.

- 7 of the 47 samples were returned for the container lid interlock components separating from the lid assembly.

- 3 of the 47 validated return samples were found to have an interlock switch which would not activate due to manufacturing tolerances of the interlock mechanism.

- 21 of the 100 return samples did not contain return tags.  3 of the samples were found to have interlock switches which would not activate due to manufacturing tolerances of the interlock mechanism.   2 of the 12 samples which were not warranty issues, were returned for the container lid interlock components separating from the lid assembly.

- (3 of the first 47 had interlock switches which would not activate.)

- 3 of the samples were found to have switches that would not activate due to manufacturing tolerances.

  So this would be 6 out of a total of 68 or about 9% of the units found, had a failure in the interlock mechanism.


E-mail from Victor Tang to Audrey Gappy
September 15, 2010

- At this moment, it is difficult for the supplier to know the real root cause, please let us know if we have the chance to see the defective sample for root cause.


E-mail from Tony Judge to Chris Cyrenne (Director of Risk Management, Walmart Canada)
September 22, 2010

- In 100 GE units examined, 3% of the motors could be started by manually pressing the actuator rod.

- I understand the U.S. does not plan to ship any more product until the design change has been implemented.

<u>E-mail from Chris Cyrenne to Tony Judge</u>
<u>September 23, 2010</u>

• At this time, based on the inspection deficiency identified, I would agree with the position on not shipping further product until the correction has been implemented.

<u>Consumer Injury</u>
<u>September 23, 2010</u>

• A Kentucky consumer received injuries to her hand and fingers when the blade started to spin while she reached in to remove an onion from the bowl of the food processor.

<u>E-mail from Jorge Garcia to Demeter Enterprise</u>
<u>October 15, 2010</u>

• Need you to get involved in rework.

• Improper operator training is a weak excuse.

• If operator influence can cause the unit to not be properly checked then we need to develop a fixture to prevent the possibility.

• We have at least one claim and more complaints of the units turning on when the lid is open.

• Every one of the claims and complaints are reported to CPSC.

• I cannot express the seriousness of getting this right – no more excuses – let's fix the issue.

<u>Consumer Injury</u>
<u>October 22, 2010</u>

• An Oklahoma consumer was injured when the blade began to spin when she placed it on the food processor.

<u>Consumer Injury</u>
<u>November 3, 2010</u>

•    A Missouri consumer sustains cuts to her hand and fingers.


<u>Consumer Injury</u>
<u>November 17, 2010</u>

•    A Florida consumer receives cuts to her hand and fingers.


<u>Consumer Injury</u>
<u>December 6, 2010</u>

•    Walmart learned that a New Jersey consumer's fingers were cut when the food
processor's safety interlock failed.


<u>Consumer Injury</u>
<u>January 5, 2011</u>

•    An Illinois consumer sustains cuts to her hand and fingers.


<u>Consumer Injury</u>
<u>January 21, 2011</u>

•    A Kansas consumer sustains cuts to her hand and fingers.


<u>Consumer Injury</u>
<u>February 11, 2011</u>

•    A Massachusetts consumer sustains cuts to her hand and fingers.

E-mail from Brad Irvine (GE) to Charlene Begley (GE)
February 10, 2011

•   There is a potential recall issue with the current GE Food Processor under the
    Walmart small appliance license agreement.

•   We feel Walmart has not taken aggressive enough action to protect the GE brand
    and our consumers.  Therefore, we exercised our contractual right and notified
    Walmart that they are immediately stop production, distribution and sales of the
    product.

•   Walmart has been instructed to proactively inform the CPSC of the potential issue
    and a detailed evaluation is underway.

E-mail Jorge Garcia to William Hamlett and Erick Moreira
February 10, 2011

•   A short summary of food processor.

•   They contacted us to see if we had any claims from U.S. customers.
    I believe we had 1 or 2 at the time.

•   We did not have any samples so we brainstormed and found that process control at
    the factory was inadequate.

•   We found that during some of the units could be actuated if the food processor was
    turned on and the user accidentally hit the top of the spindle.

•   The intent of the design is that it should not be possible, but due to tolerance stack
    ups some of the units could be actuated when the lid is not on.

•   Short term corrective action was implemented for 100% inspection.  This was
    implemented in mid-to late September 2010.

•   The spindle was redesigned to prevent the potential for process issues could result
    in units actuated by pressing top of spindle.   This was implemented in December
    2010.

•   We corrected the issue identified but we have not examined an actual unit.

24

- QC found a sample where the unit will not turn off even if the lid is removed. We found that a plastic part was damaged and resulted in the safety switch being actuated all the time.

- 3 samples were found that were perceived as potentially having the identified issue.

February 10, 2011

- Sales of the GE food processor are stopped.

Consumer Injury
February 21, 2011

- Consumer in Louisiana states he injured his hands and fingers when he pushed the blade into the place on the food processor.

Consumer Injury
March 10, 2011

- Consumer in Alabama states that the food processor malfunctioned and cut his hand and fingers.

Consumer Injury
April 8, 2011

- Consumer in Massachusetts claims food processor malfunctioned and cut four fingers.

April 29, 2011

- According to Joe Bussell's testimony, Walmart receives a letter of inquiry from the CPSC and that this is the first time Walmart considered recalling the product.

<u>Consumer injury</u>
<u>May 3, 2011</u>

- Consumer in Indiana claims food processor's blades started to spin when he put the blade onto the food processor and injured his finger.

<u>E-mail from Colleen Sabo (GE) to Michelle May (GE)</u>
<u>May 23, 2011</u>

- We did our best to soften the language of the recall.

<u>Section 15 Report from Wal-Mart Stores to CPSC</u>
<u>May 25, 2011</u>

- 58 incident reports, 24 of food processors operating without the lid in place, of which 21 resulted in injuries to fingertips.

<u>Press Release  Walmart Recalls GE Food Processors Due to Laceration and Fire Hazard</u>
<u>May 25, 2011</u>

- 255,000 units

- Hazard:  The safety interlock system on the recalled food processor can fail allowing operation without the lid secured which poses a laceration hazard.

<u>July 26, 2013</u>

- Injury to Tina Blankenship

Section 15 of the CPSA

Section 15(b) [15 USC 2064(b)] of the Consumer Product Safety Act requires manufacturers of a consumer product and every distributor and retailer of such product to report to the Consumer Product Safety Commission when they obtain information that reasonably supports the conclusion that their product either:

- fails to comply with any rule or regulation under any Act enforced by the Commission,

- contains a defect which could create a substantial product hazard or

- creates an unreasonable risk of injury or death.

The CPSC regulations at 16 CFR 1115 further define these responsibilities.

Section 1115.4 defines defect, at a minimum, as flaw, fault, weakness or failure in a product. It can be a defect in manufacture or design. At a minimum, defect includes the dictionary or commonly accepted meaning of the word. Thus, a defect is a fault, flaw, or irregularity that causes weakness, failure, or inadequacy in form or function. In addition, the design of and the materials used in a consumer product may also result in a defect. Thus, a product may contain a defect even if the product is manufactured exactly in accordance with its design and specifications, if the design presents a risk of injury to the public. A design defect may also be present if the risk of injury occurs as a result of the operation or use of the product or the failure of the product to operate as intended. A defect can also occur in a product's contents, construction, finish, packaging, warnings, and/or instructions. In addition, this section states that "subject firms are urged to report if in doubt as to whether a defect could present a substantial product hazard." The Commission provides examples of "defects" to be evaluated, including this definition at 16 CFR 1115.4(d).

(d) A power tool is not accompanied by adequate instructions and safety warnings. Reasonably foreseeable consumer use or misuse, based in part on the lack of adequate instructions and safety warnings, could result in injury. Although there are no reports of injury, the product contains a defect because of the inadequate warnings and instructions.

27

The rule requires reporting within 24 hours of reasonably obtaining the necessary information.  Walmart and GE failed to report in a timely manner.

Section 1115.12(a) reiterates the Commission's view, and states that companies should not delay reporting to determine to a certainty the existence of a defect.  The firm is not required to admit the existence of a defect, but is required to report information about the potential danger to the CPSC so that an evaluation of the hazard and the need for corrective action such as a recall can be reviewed.  There is no requirement that an injury occur before reporting.

Section 1115.12(d) states:

> *Death or grievous bodily injury.*  Information indicating that a noncompliance or a defect in a consumer product has caused, may have caused, or contributed to the causing, or could cause or contribute to the causing of a death or grievous bodily injury (e.g., mutilation, amputation/ dismemberment, disfigurement, loss of important bodily functions, debilitating internal disorders, severe burns, severe electrical shocks, and injuries likely to require extended hospitalization) must be reported, unless the subject firm has investigated and determined that the information is not reportable.

Under Section 1115.12(f), the Commission lists examples of information that a company should study and evaluate to determine whether to report to the Commission.  These include:

- Engineering, quality control or production data
- Safety-related production or design change(s)
- Product liability suits and claims for injury or property damage
- Information from independent test labs
- Complaints from a consumer or consumer group

Applying the criteria above, the GE food processor never should have been sold to consumers.  If sold, a report to the CPSC should have been forthcoming within 10 days of sale.

<u>Food Processor Instruction Manual</u>

A review of the GE food processor, model 169203, instruction manual reveals:

- The motor is automatically energized and in the on position when the plug is inserted in the outlet.

- There is no explanation of how the interlock functions to stop the blade when the lid is removed.

- After slicing, chopping, shredding or any use of the processor, the user is instructed to push the on/off button and wait until the blade has stopped rotating before removing the lid.

- There is no instruction on the procedure to remove food from the bowl after the blade has stopped.

- The clear indication to users is that once the on/off button is pushed, the power to the blade is removed, and the blade cannot rotate.

- There is no instruction to unplug the food processor before removing food from the bowl.

- The instructions are clearly inadequate and create an unreasonably dangerous condition upon failure of the interlock as well documented prior to sale to Tina Blankenship.

- The confusing and poorly written manual is exemplified by the last entry under "Important Safeguards:"

> Do not use the appliance without the interlock construction disengaged to avoid injury.

<u>Opinions</u>

Based upon my education, training, experience and review of the documents, my opinions to a reasonable degree of safety management certainty include the following:

1.      Walmart and General Electric (GE) failed to adequately protect their customers from the substantial risk of injury associated with the intended and foreseeable use of the GE food processor.

2.      As manufacturer, distributor, licensee and retailer of the GE food processor, Walmart and GE acted with a clear, conscious and reckless disregard for the safety of their customers.

3.      Walmart failed to remove the food processors from their shelves, initiate a recall to remove the product from the hands of consumers and inform consumers of the danger in a timely manner.

4.      Walmart and GE failed to apply the accepted principles of product safety management to adequately:

a)      Establish and observe a written corporate safety policy

b)      Identify product hazards and evaluate severity

c)      Perform a risk assessment to adequately integrate product hazards, the environment and foreseeable consumer use

d)      Monitor the safety performance of their product

e)      Take adequate corrective actions to eliminate, guard or warn consumers of the danger and motivate them to avoid injury.

5.     Walmart and GE were on notice as early as July of 2009 that the GE food processor that injured Tina Blankenship in July of 2013 contained a safety interlock that did not function well and could bring serious critical issues in respect to product safety. In July 2009, the Walmart Global Procurement office agreed that the product has a "potential safety risk." As late as February of 2011, Walmart continued to find interlock failures.

6.     Based on the knowledge of both GE and Walmart, the food processor created a substantial risk of injury before it was ever sold to the public, yet sales continued from 2009 to 2011 while efforts to identify the root cause and correct the defect failed.

7.     Under the Consumer Product Safety Act (CPSA), Walmart, as the direct importer of the GE food processor, is defined as the manufacturer under 15 USC 2052(a)(4) and the regulations at 16 CFR 1009.3.

8.     In their capacity as both a manufacturer and retailer, Walmart failed to report to the Consumer Product Safety Commission that their product "contained a defect which could create a substantial product hazard" as required by Section 15 of the Act [15 USC 2064] and the regulations at 16 CFR 1115 in a timely manner. Walmart had clear pre-distribution knowledge of the defect and never should have sold the product to the public without first insuring that the interlock did not create an unreasonably dangerous defect. Failing to stop distribution, a report should have been forthcoming immediately upon sale to the public.

9.     Walmart and GE failed to adequately warn consumers of the danger of the food processor containing a defective safety interlock and the accompanying harms caused by a defective safety interlock.

10.     Only after a mounting number injuries and further evidence confirming that the food processor was unreasonably dangerous and defective, pressure from GE Corporate forced Walmart to pull-and-hold the GE Food Processor and contact the CPSC Compliance Office to outline the risk of injury associated with the food processor. It was only after Walmart received a subsequent letter from the CPSC requiring both the

filing of a full report and initiation of a recall under Section 15 that Walmart reluctantly agreed to these actions.

11.     Walmart Senior Manager for Recalls insists that there was no reason for Walmart to either report to the CPSC nor to initiate a recall.  Walmart claims that they do not have the capability to identify product defects because they are only a retailer and that no recall was necessary to adequately protect the public.

12.     Tina Blankenship was injured due to the failure of the interlock on the subject GE food processor to prevent the sharp metal blades from rotating at high speed when the lid was removed from the container.  Such failure was the reason that the subject food processor was recalled.


Mr. Bussell's deposition contains myriad inaccurate statements concerning the recall and reporting system at the CPSC and the responsibilities of Walmart as a direct importer/manufacturer and retailer to adequately protect their customers from the unreasonably dangerous condition created by the GE branded Walmart food processors that were manufactured by Demeter Enterprises/China under product specifications developed by Walmart Global Procurement.  The food processors were imported directly and exclusively for sale in Walmart stores.

As noted above, manufacturers, distributors and retailers are all required to notify the CPSC upon obtaining information that their product contains a defect which could create a substantial product hazard.

Seventy-five (75) percent of all unprompted company initiated notifications to the Commission result in a fast track recall where the company makes a decision, at the time of notification and the filing of a full report under Section 15(b) and the regulations at 16 CFR 1115.13, to implement a recall within approximately 20 days.

As noted above, Walmart is both the importer, manufacturer and retailer of the subject GE food processor.  For Walmart to claim that they are just a retailer and don't have the resources or the capability to evaluate a product defect is clearly belied by the

involvement of Walmart in the evaluation process for the GE food processor as identified above.

Contrary to Mr. Bussell's assertion that Walmart would have no knowledge of any interlock failure prior to the product being shipped is clearly contradicted by their own emails.

Any time a recall is entered into prior to the Commission commencing an administrative hearing under Sections 15(c) and (d), that recall can be called voluntary even where the Commission clearly informs the subject party that a recall is appropriate.

Mr. Bussell's statement that recalls only occur when there is a safety issue deemed by the CPSC to necessitate a recall has no basis in fact.

Walmart ultimately did decide to conduct a recall in apparent response to the request for a full report by the CPSC. Evaluation of the subject CPSC letter, which has not been made available, from CPSC to Walmart would assist in a fuller understanding of that interaction.

Walmart firmly states after at least 20 substantial laceration and amputation injuries and prior to the Section 15 report requested by the CPSC, the subject food processor does not contain a defect that "could create a substantial product hazard" and does not require a recall. Since July of 2009 up through the time of the recall, Walmart, GE and Demeter have failed to adequately protect the public from known severe injuries under intended and foreseeable conditions of use.

Under Section 1115.12(f) of the Commission regulation substantial hazard reports, there is a list of information which should be studied and evaluated as part of the necessity for a Section 15(b) report. That information includes:

1.  Information about engineering, quality control or production data
2.  Information about safety-related production or design changes
3.  Product liability suits and/or claims for personal injury or damage
4.  Information from an independent testing laboratory
5.  Complaints from a consumer or consumer groups

All are clearly sources of information available to Walmart well before the injury to Tina Blankenship, and all point to the need to remove the GE food processor from Walmart shelves and to recall the product from the hands of consumers prior to Ms. Blankenship's injury.

Even after the Consumer Product Safety Commission required a complete full report from Walmart as outlined in 16 CFR 1115.13, Walmart failed to provide truthful and accurate information to the Commission outlining their knowledge of the documents identifying a defect that could create a substantial product hazard. On May 25, 2011, Cara Rose submitted the full report to the CPSC compliance office. Section 1115.13(d)(6) requires all information concerning the manner in which and the date when information about the defect, including complaints, quality-control testing was obtained. It further requires the subject firm to provide a chronological account of facts or events leading to the report under Section 15(b) of the CPSA, beginning with the receipt of the first information which ultimately led to the report.

The chronology of notice and knowledge outlines the information that would be included under this request by the Commission and would be critical to the Commission's understanding of the potential dangers associated with the foreseeable use of the product to consumers. Yet Walmart provided only a spreadsheet of incidents. Clearly, the information required by regulation was not provided.

Under Section 1115.13(d)(10), the Commission requests an explanation of any changes in design, adjustment, parts, quality control or testing that may have been or will be effected to correct the defect. Walmart's response was that the product will be recalled on May 25, 2011 and there's no information provided concerning all the attempts by Walmart and Demeter to correct the problem and their failure to do so.

Finally, Walmart agreed to do only the minimum of putting out a press release and putting posters someplace in the store. Considering the fact that a quarter of a million products were distributed to unwitting consumers and the substantial injury that results from not only foreseeable but intended use, additional steps were needed in order to inform consumers of the dangers.

Over the years, other companies have determined that it was necessary to go beyond minimum requirements in the store to notify consumers.

> Fisher-Price took a junior full-page ad in Parade magazine to inform consumers of the danger associated with the tension rods in their playhouse.
>
> Restoration Hardware placed posters at every register in every store to catch consumers attention.
>
> Global Industries took two ads in USA Today to further disseminate information about a defective chair.
>
> Casio took a large ad in the New York Times recalling their keyboard concerning a smoke or fire hazard.

Nearly every Sunday, Walmart distributes a Sunday supplement in papers around the country advertising their products for sale. It is undoubtedly intended to reach Walmart shoppers, people who purchase products from the company. It would be a highly appropriate and effective venue for Walmart to use that supplement for the same type of marketing they used to sell products to inform consumers about recalls and potential dangers associated with products that they sold.

Walmart claims that their "customers trust us to be their advocate" and that they are "committed to protecting the health and safety of our associates, members, customers and communities because we care for one another's well-being."

They state that "Acting ethically in regards to health and safety issues is critical to our corporate goal of providing a safe shopping and working environment ."

Yet, Walmart contends that no recall of the subject GE food processor was ever necessary, and that there is no reason to protect consumers from the clearly known laceration and amputation injuries.

Wm 7 Vitzes

June 15, 2015

35

Compensation for research and analysis is $1950 per 8 hour day.  Fees for deposition and trial are $2950 per day.

## Materials Relied Upon

WMHOe-003717-001-00001810 – 00001812
WMHOe-003717-001-00001644 - 00001662
WMHOe-002208-008-00004600 – 00004601
WMHOe-003717-001-00001836 – 00001837
WMHOe-002208-008-00003941 – 00003944
WM09001 – WM09009
WMHOe-003717-001-00000131 – 00000132
GE02133 – GE02134
GE02136 – GE02139
WMHOe-002207-013-00000073 - 00000074
WM07917 – WM07918
GE02062 – GE02069
WMHOe-003717-001-00001239
WM00015 – WM00016
WMHOe-003717-001-00001247 – 00001251
WMHOe-003717-001-00001075 – 00001077
WMHOe-002007-011-00000406 – 00000407
WMHOe-003748-001-00001077
WMHOe-003717-001-00005129
WMHOe-420093-004-00001253-00001258
GE00063 – GE00066
GE00021 – GE00023
GE02166
GE00424-00427
GE00655-00656
GE01500
Deposition of Joe Bussell in Locke – 1-27-2014
Deposition of Joe Bussell – 5-29-2015
Deposition of Cara Rose – 5-28-2015
Deposition of Jorge Garcia – 5-29-2015
GE Food Processor model 169203 Instruction Manual
UL 982
Report of Dr. Robert Block

Press Release  Walmart Recalls GE Food Processors Due to Laceration and Fire Hazard
       May 25, 2011
Consumer Product Safety Act and Regulations
16 CFR 1009.3
Walmart Website
CPSC Handbook and Standard for Manufacturing Safer Consumer Products
Recall ads by Fisher Price, Global Industries, Casio
Restoration Hardware Poster and Placement