# EXHIBIT B

41

1  Q. Okay. So the Walmart Global Statement of Ethics, the
2     Walmart Minimum Requirements for Suppliers, and the
3     Walmart Requirements for Suppliers was all pulled
      specifically for this case?
5  A. Yes.
6  Q. And obviously you were provided the deposition
7     testimony of Joe Bussell from the Locke case from 2014
8     and 2015.
9        These notes that you've pulled from those
10    depositions, is that a summary of what you felt was
11    important from those depositions?
12 A. Yes.
13 Q. Were you provided with the deposition of Tracy
14    Lieberman?
15 A. Not that I recall.
16 Q. So you were just provided with depositions of Joe
17    Bussell, both from the Locke case and from the
18    Blankenship case, as well as Cara Rose and Jorge
19    Garcia.
20       Do you know if you had read Mr. Garcia's
21    prior testimony in the Locke case?
22 A. I have not.
23 Q. You just read his testimony in this case?
24 A. Yes.
25 Q. To the extent in your chronology of events, would it

42

1     be fair to say that you're paraphrasing some of the
2     e-mails or are you actually direct quoting some of the
3     e-mails?
4  A. It's not a direct quote, but I try to use as many of
5     their words as I could, you know, so I didn't have to
6     write out the whole e-mail.
7  Q. Is there a way to determine what is paraphrasing
8     versus a direct quote?
9  A. Only by comparing.
10 Q. Okay.
11 A. It's, you know... I mean, overall, I think it's my
12    understanding of what came out of those documents.
13 Q. All right. I am going to get to the recall itself.
14       Tell me, what is your understanding of why
15    the product was recalled.
16 A. According to whom?
17 Q. According to the CPSC.
18 A. Well, the CPSC wrote to Walmart and said that they had
19    reviewed information, I believe, about incidents.
20    Now, I got to tell you that nobody has been able to
21    produce that letter.
22 Q. Okay.
23 A. Okay? I only get this from Mr. Bussell's deposition.
24    So I can't quote you specifically the CPSC's reasons
25    other than, you know, at some point and based on some

43

1     data, they asked for a full report. Now, asking for a
2     full report is not asking for a recall. If you look
3     at 16 CFR 1115, I believe it's .7, it lists out the
4     information the commission requests as part of a full
5     report.
6        A full report is something that a
7     manufacturer, distributor or retailer is required to
8     provide to the commission after making an initial
9     report that their product, they have information that
10    reasonably leads to the conclusion that their product
11    contains a defect that could create a substantial
12    product hazard, or in another section, an unreasonable
13    risk of injury.
14       So the commission said, we have some
15    information and we cannot be fully informed until you
16    file a full report, which includes a listing of all
17    the injuries. It includes how it was discovered, when
18    it was discovered, and things like that. I probably
19    do have the exact language in the pile.
20 Q. Well, let me back up then. Do you recall what the
21    date of the recall was for the GE food processor?
22 A. The date of the press release was May 25th, 2011. Let
23    me just double-check that for you.
24 Q. Was that also the date of the 15(b) Report Walmart
25    provided to the CPSC?

44

1  A. Well, that's what my outline says. That would be
2     highly unusual for the 15(b) Report to be made the
3     same day the press release goes out.
4  Q. Why do you say that?
5  A. Because you just need more time than that to notify
6     people. I've never actually seen, uh, you know,
7     unless some, you know, the date's kind of crossed out
8     on the full report from Cara Rose, but that's all the
9     information I have.
10 Q. Do you have the actual recall notice from the CPSC as
11    part of your material?
12 A. Yes.
13 Q. What was the basis or what was the reason that was
14    listed in that recall notice as to why the product was
15    recalled?
16 A. The safety interlock system on the recalled food
17    processor can fail, allowing operation without the lid
18    secured, which poses a laceration hazard, and there
19    was also a fire hazard issue; in that there were 58
20    incident reports, 24 reports of food processors
21    operating without the lid in place, which resulted in
22    21 injuries.
23 Q. Call you tell me how you define substantial product
24    hazard. How are you defining that term?
25 A. Well, a substantial product hazard is a hazard that,

Page 61

1 percent of the units to exhibit the defect. And then
2 you have the September 23rd. Then on October 15th,
3 Jorge Garcia writes to Demeter. Says, we have a
  problem.
  Q. But my point is --
6 A. There was no more testing after that.
7 Q. After the September testing?
8 A. No. I don't see any from September 23rd, '10 to
9 February 10, 2011.
10 Put my glasses back on. Make sure I'm not
11 missing anything.
12 More injuries, more injuries. Then on
13 September 10th, GE apparently exercises their contract
14 right and stops sale at Walmart. You know, and on
15 that same day, Jorge Garcia and Mr. Hamlett noted that
16 they continued to have problems that it's doing things
17 it's not supposed to do.
18 I don't see any other testing. If I'm
19 missing something and you've got something, I'm happy
20 to look at it.
21 Q. Are you aware of any other design changes to the
22 product after September 10th, 2010?
23 A. Not that I'm aware.
24 Q. I'll tell you what, let's take a break for just a
25 minute, and then we'll get into specifically your

Page 62

1 opinion, okay?
2 A. Um-hum.
3 (Recess taken at 10:58 a.m.)
4 (Back on the record at 11:07 a.m.)
5 BY MS. NOEL:
6 Q. I am on page 30 of your report, and I think we talked
7 about number 1 sufficiently.
8 A. Right.
9 Q. Tell me on what basis you make your statements that
10 Walmart and GE acted with a clear, conscious and
11 reckless disregard for the safety of their customers.
12 A. It's my opinion that they knew that people were going
13 to get hurt. I'm not saying they intended people to
14 get hurt, but they knew that the longer that product
15 stayed on the market and the longer they sold it, the
16 interlock was going to fail and result in substantial
17 injuries and I think that for whatever, they continued
18 to sell it based with that knowledge.
19 Q. With respect to number 3, I think we've talked about
20 that, because as I understand your opinions, it's
21 basically your position that the food processor never
22 should have been sold?
23 A. That's right. And then once it was sold, from that
24 point going forward, every time another test showing a
25 defect or another injury occurred, that was just

Page 63

1 another reason why it should have been stopped and
2 recalled.
3 Q. And looking at number 4, Walmart and GE failed to
4 apply the accepted principles of product safety
5 management to adequately establish and observe a
6 written corporate safety policy. You had that same
7 opinion in the Landis case, did you not?
8 A. Yes.
9 Q. Okay. Is that typically an opinion you have against
10 manufacturers and retailers?
11 A. It depends if they do or they don't.
12 Q. To the extent that you found that same opinion in the
13 Landis case, was it predetermined in your mind that
14 they were going to have failed in this case?
15 A. Absolutely not.
16 Q. And why do you say that?
17 A. Because it's a question of whether they did or they
18 didn't. I mean, there's some things in the quotes
19 from Walmart... You know, I didn't say they had none.
20 I said not adequate, you know, that would identify
21 good traits that a manufacturer would follow. From a
22 corporate safety policy point of view, I don't think
23 they applied them in this case.
24 Establish and observe. I haven't seen a
25 methodology that Walmart gives to their associates,

Page 64

1 their managers, their buyers, somebody, that describes
2 how to view or who's going to view the safety of the
3 product. I mean, I think that -- I'm not saying they
4 didn't look at it 'cause they clearly did -- but what
5 they found was disturbing.
6 Q. Have you asked for any written corporate safety
7 policy?
8 A. No.
9 Q. With respect to Walmart subsection (b), identify
10 product hazards and evaluate severity, tell me what
11 you mean by that.
12 A. Well, the hazard is the failure of the interlock with
13 the lid open and the blades continuing to spin and
14 causing very severe injuries to people's hands, you
15 know? I mean, maybe they knew that, you know, and I
16 think you can make a case for the fact that they knew
17 that, but the fact that they didn't act on it is a
18 very serious problem.
19 Q. With respect to subsection (c), perform a risk
20 assessment to adequately integrate product hazards,
21 the environment and foreseeable consumer use?
22 A. I just didn't see where they did that at all. Again,
23 I think they knew what the defect was, but if they had
24 done that and written it down, I don't understand how
25 they could have continued to sell the product.

65

1 Q. And how about monitoring the safety performance of
2 their product, why do you believe they failed in that
3 regard?
A. Well, that, you know, they may have done adequately.
They kept a list, you know, and that's a good thing,
6 but again, monitoring and having the list is one
7 thing, but then you have to go to (e), which is where
8 they abjectly failed to take any kind of adequate
9 corrective action.
10 Q. So you don't believe the initial rework of the spindle
11 assembly was an effort to take corrective action to
12 eliminate the potential?
13 A. But they knew right away it didn't work. I mean,
14 yeah, yeah, it was an attempt, but it was a failed
15 attempt. They knew that right away, but they
16 continued anyway.
17 Q. Number 6, you have: Based on the knowledge of both GE
18 and Walmart, the food processor created a substantial
19 risk of injury before it was ever sold to the public,
20 yet sales continued from 2009 to 2011, while efforts
21 to identify the root cause and correct the defect
22 failed.
23         And obviously I understand that's your
24 opinion in this case, but would you agree with me that
25 there were efforts undertaken by both Walmart and GE

66

1 to identify the root cause?
2 A. Unsuccessful ones, but yes, efforts.
3 Q. And I think you've testified earlier that you weren't
4 aware of any design changes undertaken to try and
5 eliminate those risks?
6 A. Post-September 23rd.
7 Q. Right. You're not aware of anything?
8 A. Correct.
9 Q. The second-to-the-last paragraph on page 32, can you
10 tell me what you're trying to tell me there 'cause I
11 just couldn't understand what you were saying.
12 A. Okay.
13        MR. CARR: Which one?
14        MS. NOEL: Starting with 75 percent of all
15 unprompted company initiated notifications to the
16 commission.
17 A. Sure. Unprompted company initiated notification means
18 where, without the commission writing to the company,
19 the company under 15(b) takes the responsibility to
20 report to the commission, okay?
21         And then what I'm saying is that 75 percent
22 of those notifications, of those Section 15(b)
23 notifications, result in a fast-track, which is where
24 the company comes to the commission and says, okay, I
25 got this problem, here's what I'm going to do about

67

1 it, all on their own, that's all.
2 BY MS. NOEL:
3 Q. What does that have to do with this particular case?
4    Did Walmart conduct a fast-track recall in this case?
5 A. It's hard to tell 'cause I don't have the information,
6 but what it wasn't was unprompted, but I'm just saying
7 that in most cases the commission does not make a
8 determination as to whether the product presents a
9 substantial hazard and they go with the company's
10 corrective action plan and do it fairly quickly.
11 Q. Are you aware of any company that has placed recall
12 notices in its weekly flyers?
13 A. In its weekly flyers, no. In magazines and in other
14 places, yes. In the weekly flyer, no, which is a real
15 shame.
16 Q. With respect to the examples that you gave regarding
17 notification to customers, there's a difference
18 between products that are sold to children and
19 products that are utilized by adults, correct?
20 A. I would say so.
21 Q. Okay. And there's different notifications required by
22 the CPSC as a result of that, correct?
23 A. Generally, no.
24 Q. Why do you say that?
25 A. I don't understand what you mean.

68

1 Q. Well, obviously to the extent that there's a recall
2 involving, say, a child's toy, doesn't that have
3 different reporting, recall reporting obligations
4 typically by the CPSC?
5 A. I don't understand if you're making a distinction
6 between the Hazardous Substances Act and the Consumer
7 Product Safety Act, but the commission goes with the
8 Product Safety Act, and the notification requirements
9 here are the same.
10 Q. And along those lines, to the extent that Consumer
11 Product Safety Commission is intimately involved with
12 the recall process, they have to approve it, correct?
13 A. Yes.
14 Q. And the CPSC approves the corrective action plan?
15 A. Well, yes. The CPSC does not require notification
16 beyond posters. I don't know where Walmart put the
17 posters up in this case. When I did a recall for
18 Restoration Hardware, we put a poster at every single
19 register so that people got the word. Many retailers
20 put them by the service desk, by the bathroom, where
21 consumers never get a chance to see them. I don't
22 know where Walmart put this poster up.
23 Q. Okay. Did you ask?
24 A. No.
25 Q. And the CPSC also mandates the length of time for

**Page 73**

1  MR. CARR: Object to form.
2  A. Yes. They didn't sue the commission to prevent them
3     from doing it.
   BY MS. NOEL:
5  Q. Well... And along those lines, Walmart worked with
6     the commission to have the corrective action plan
7     approved, correct?
8  A. Well, sure.
9  Q. Did you perform a risk assessment in this case with
10    respect to the food processor?
11 A. As part of my report, I think I assessed the risk.
12 Q. Did you use a quantitative risk assessment or did you
13    use a qualitative risk assessment?
14 A. Absolutely qualitative.
15 Q. Okay.
16 A. There is no quantitative risk assessment as it relates
17    to the evaluation of substantial hazards like this
18    product.
19 Q. And what did your qualitative risk assessment involve,
20    just your review of all of these materials?
21 A. Yes, as the product hazards, environment, foreseeable
22    use. It's all part of my methodology.
23 Q. I guess what I'm trying to determine is how you came
24    up with your opinion that the risk was substantial
25    versus reasonable or normal?

**Page 74**

1  A. Well, it can't be reasonable if there's a defect that
2     chops people's fingers off in a food processor.
3     That's not reasonable.
4  Q. Well, I guess what I'm struggling with is the fact
5     that you have a product that is inherently potentially
6     dangerous because it has sharp edges, right?
7     I mean, a food processor, a knife, you
8     can't eliminate the risk.
9  A. The blade is sharp and can cut.
10 Q. Correct.
11 A. Yes.
12 Q. So what I'm trying to determine is what you looked at
13    to assess that it was higher than reasonable or
14    normal, even taking into consideration that it has
15    sharp parts.
16 A. Well, it's not the blades. It's the fact that
17    unexpectedly, when your hand is in the bowl, under
18    foreseeable conditions of use, the blade can start
19    rotating and mangle or chop off your fingers. There's
20    nothing reasonable about that. If you're going to
21    tell me that it's okay to do that to 10 people if you
22    sell X number of products or 20 people if you sell
23    twice as many products, I think that's absurd and does
24    not reflect 50 years of scholarship in the area of
25    product safety. There's no level of unexpected finger

**Page 75**

1     chopping that is acceptable.
2  Q. And my question to you though is, to the extent --
3     what do you believe was foreseeable, that people would
4     stick their hand in the food processor with it plugged
5     in?
6  A. Sure.
7  Q. Okay. You believe that's foreseeable?
8  A. Absolutely.
9  Q. Even though there were warnings in the food processor
10    manual about not doing that?
11 A. No. No, no, no, no. Not clear. There were serious
12    deficits in the manual.
13 Q. The language used in the manual, though, was what was
14    required by UL, correct?
15 A. No. I mean, there may have been... I don't know the
16    answer to that, to tell you the truth.
17 Q. Okay.
18 A. But the manual certainly never warned people that that
19    could happen and, I mean... But here's the problem,
20    you would never -- Walmart would never warn people
21    that the product would unexpectedly turn on and mangle
22    their fingers. The reason for that, they're not going
23    to be able to sell any.
24    So if Walmart knew that and they don't want
25    to tell people about it, how could it be reasonable

**Page 76**

1  when somebody's left without the use of their hand?
2  Q. Is it your testimony that it was... Well, I think it
3     has been your testimony that to the extent that these
4     actuations of the interlock or the failures of the
5     interlock, there was no discernible pattern to that,
6     as I understand your testimony.
7  A. Well, only that it appeared regardless of what
8     configuration of the food processor was involved.
9     Sometimes it happens, sometimes it didn't.
10 Q. And I guess my question is, it's because of that,
11    sometimes it happens, sometimes it didn't, that's not
12    your criticism regarding the foreseeability, if that
13    makes sense? You're looking at me like it doesn't
14    make sense.
15    Well, I'm trying to determine, when you say
16    Walmart needed to evaluate the foreseeability if the
17    interlock wouldn't fail on a predictable basis, is
18    that the foreseeability you're talking about?
19 A. Say it again. If it would fail?
20 Q. Correct.
21 A. Well, if it would fail on a predictable basis and that
22    was foreseeable to Walmart, how could they distribute
23    the product, knowing the clearly foreseeable
24    consequences? And to me that goes for an intermittent
25    basis also, because on an intermittent basis you just

93

1 Q. Didn't distribute it?
2 A. No.
3 Q. Didn't sell it?
4 A. No.
5 Q. Now, you made a comment about the rights that GE has
6 in regard to the food processor.
7 Do you know where those rights are set
8 forth?
9 A. I'm sure it would be in a licensing agreement.
10 Q. And that's what I wanted to ask you about.
11 You never reviewed the trademark license
12 agreement between GE and Walmart, have you?
13 A. No, it just came out of that memo on February 10th.
14 Q. Okay, I understand.
15 What you're saying is that you knew it
16 existed because it was referenced in the e-mail that
17 Mr. Irvine sent on February 10?
18 A. That it existed and the critical point.
19 Q. Okay. You've never reviewed the trademark license
20 agreement itself, have you?
21 A. No.
22 Q. You couldn't tell us what the relationship is between
23 GE and Walmart spelled out in that agreement, could
24 you?
25 A. In total?

94

1 Q. Yes.
2 A. No.
3 Q. In part, can you tell us anything about it?
4 A. Well, I just know from that memo that GE had the
5 contractual right to shut it down if they felt it was
6 an inappropriate product and the next day, in fact,
7 sales were stopped.
8 Q. And is that the sum total of what you know about the
9 rights between the two parties in that agreement?
10 A. Yes, sir.
11 Q. Mr. Kitzes, you've not reviewed any GE corporate
12 safety policies for licensed products in the formation
13 of your opinion, have you?
14 A. No.
15 Q. Mr. Kitzes, if you would turn with me to pages 30 to
16 32 of your report, and Ms. Noel has already gone
17 through these. Here's what I want to do, I want to go
18 through them and focus on what your allegation is
19 specifically to GE in those.
20 So the first one, and I'll just read it
21 quickly for the record: Walmart and General Electric
22 failed to adequately protect their customers from the
23 substantial risk of injury associated with the
24 intended and foreseeable use of the GE food processor.
25 That's your conclusion, that Walmart and GE

95

1 breached a duty that they had in this case?
2 A. Well, that's not my language, but yes.
3 Q. And for GE, what's the factual basis that underpins
4 that opinion?
5 A. Well, everything that's in my report. I mean, we've
6 gone through all of this.
7 Q. And I just want to focus on GE. What's the factual
8 basis for your conclusion that GE...
9 A. They were apprised at the very beginning that there
10 was a problem. They had the right and the
11 responsibility, according to their memo, to exercise
12 their contractual right and notify Walmart that they
13 immediately stop production, sales, and sales of the
14 product.
15 Now, if you tell me that in between GE had
16 their head in the sand and they weren't watching until
17 the very end, that may be one thing, but I don't
18 really believe that that's the case. You know, back
19 in November 3rd of '09, they were still involved in
20 the changed parts.
21 Q. Okay.
22 A. So I think that with the overarching capability to
23 stop sale, that as the injuries mounted, they failed
24 to do so.
25 Q. And when you say the November 3rd, are you referring

96

1 to just the entry you have on your timeline on page
2 18, internal e-mail from GE?
3 A. Yes.
4 Q. Now, is there anything else that you're contending
5 that GE did that supports opinion 1?
6 A. Those three pieces of information is all I have about
7 what GE did, so that's going to apply to all the
8 opinions.
9 Q. Okay.
10 A. It revolves around the fact that they knew from the
11 beginning there was a problem. They continued to be
12 involved in the problem. And they had the right to
13 interact and protect customers, which they finally did
14 in February of 2011, but I think that that was too
15 late.
16 Q. And so for each of these opinions that you've got that
17 you hold against GE, that's going to be the factual
18 underpinning for them?
19 A. Correct.
20 Q. They knew from the beginning there was a problem, they
21 continued to be involved with the problem, and that
22 they had the right to stop the sale?
23 A. Correct, and didn't, until February of '11.
24 Q. And when you say GE knew from the beginning there was
25 a problem, what is it that you were specifically